UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

———————————

No. 97-12
(CA-87-816-3-OK)

———————————

Samuel David Roberts,

Petitioner - Appellant,

versus

Michael W. Moore, etc., et al,

Respondents - Appellees.

———————————

O R D E R

———————————

The Court amends its opinion filed February 4, 1998, as follows:

On page 2, footnote 2, line 4 -- the phrase "§ 106 of" is deleted.

For the Court - By Direction

/s/ Patricia S. Connor
———————————
Clerk

UNPUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

SAMUEL DAVID ROBERTS,
Petitioner-Appellant,

v.

MICHAEL W. MOORE, Director, South

No. 97-12

Carolina Department of Corrections;
WILLIE WELDON, Warden, Leiber
Correctional Institution,
Respondents-Appellees.

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Matthew J. Perry, Jr., Senior District Judge.
(CA-87-816-3-OK)

Argued: October 27, 1997

Decided: February 4, 1998

Before WILKINS, NIEMEYER, and WILLIAMS, Circuit Judges.

_____

Dismissed by unpublished opinion. Judge Wilkins wrote the opinion,
in which Judge Niemeyer and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Peter L. Murphy, GLENN, MURPHY, GRAY & STEPP,
L.L.P., Columbia, South Carolina; David P. Voisin, Columbia, South
Carolina, for Appellant. Donald John Zelenka, Assistant Deputy
Attorney General, Columbia, South Carolina, for Appellees. **ON**

**BRIEF:** Sheri Johnson, CORNELL LAW SCHOOL, Ithaca, New York, for Appellant. Charles M. Condon, Attorney General, John W. McIntosh, Deputy Attorney General, Columbia, South Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

WILKINS, Circuit Judge:

Samuel David Roberts appeals a decision of the district court denying his petition for a writ of habeas corpus,**1** which challenged his South Carolina convictions on three counts of capital murder and resulting death sentences. See 28 U.S.C.A. § 2254 (West 1994).**2** The district court held that Roberts was not entitled to habeas relief on his

---

**1** Roberts named James Aiken, Warden of the Central Correctional Institution where Roberts was then incarcerated, and the Attorney General of South Carolina as Respondents in the petition. Subsequently, Michael W. Moore, Director of the South Carolina Department of Corrections, and Willie Weldon, Warden of the Lieber Correctional Institution where Roberts is presently incarcerated, were substituted for Aiken. For ease of reference, we refer to Respondents collectively as "the State" throughout this opinion.

**2** Because Roberts' petition for a writ of habeas corpus was filed in 1987, prior to the April 24, 1996 enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, Pub. L. No. 104-132, 110 Stat. 1214, amendments to 28 U.S.C.A. § 2254 effected by the AEDPA do not govern our resolution of this appeal. See Lindh v. Murphy, 117 S. Ct. 2059, 2067 (1997). And, the provisions of § 107 of the AEDPA do not apply because Roberts' state habeas petition was finally decided by the South Carolina Supreme Court before June 18, 1996, the date South Carolina purports to have adopted procedures adequate to satisfy the opt-in provisions of § 107. See Howard v. Moore, 1997 WL 755428, at *1 n.1 (4th Cir. Dec. 9, 1997) (en banc).

2

claims that he was denied the constitutionally guaranteed effective assistance of counsel; that the State failed to disclose material exculpatory information in violation of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny; that the trial court committed harmful error in instructing the jury that the element of malice necessary to prove murder under South Carolina law was presumed from the willful, deliberate, and intentional commission of an unlawful act without just cause and excuse and from the use of a deadly weapon; and that the trial court impermissibly chilled the exercise of his constitutional right to testify on his own behalf. Because Roberts has failed to make a substantial showing of the denial of a constitutional right, we deny his application for a certificate of probable cause and dismiss the appeal.

I.

The primary evidence concerning Roberts' involvement in the murders charged was the testimony of Danny Ray Coker, a participant in the crimes, who testified pursuant to a grant of immunity. Coker testified that on the evening of June 18, 1980, he traveled with Roberts and Wesley Copeland in Copeland's vehicle from Sumter, South Carolina to Charleston, South Carolina where Copeland met with an acquaintance. During their return to Sumter, Copeland formulated and --with Roberts' and Coker's assistance--carried out a plan to rob a service station. Copeland and Roberts entered the Port Oil Service Station, where William Spain and Kenneth Krause were employed, while Coker waited outside in the automobile. After robbing the station, Copeland and Roberts, who were both armed, forced Spain and Krause to enter Copeland's vehicle. Copeland then directed Coker to drive to a remote area, where the victims were forced from the automobile and shot to death by Copeland. Coker testified that Roberts refused to shoot either Spain or Krause, but promised Copeland, "I will do the next one." J.A. 423 (internal quotation marks omitted). After returning to the scene of the Spain and Krause murders to conceal evidence of their crimes--during which time Roberts repeatedly stabbed Krause's body "to make sure [he was] dead," J.A. 425 (internal quotation marks omitted)--the three men continued toward Sumter. On the way, they stopped at another service station where Coker and Roberts robbed the attendant, Louis Cakley, and abducted him at gunpoint. Copeland drove to an isolated location. After directing Cak-

3

ley to walk away, Roberts shot him in the back. Cakley fell to the ground and Roberts shot him at least twice more at close range, killing him. The three men then returned to Sumter. The following day, according to Coker, Roberts used his share of their ill-gotten gains to purchase an automobile.

Roberts defended against the charges on several grounds. First, he attempted to demonstrate through cross-examination that Coker's story was unbelievable and that he was lying to save himself. Roberts also suggested, again through cross-examination, that Coker's testimony was motivated in part by a desire to take revenge against Roberts because members of Roberts' family had testified against Coker in a previous criminal proceeding. Third, Roberts presented witnesses whose testimony indicated that Roberts could not have traveled with Coker and Copeland to Charleston because he was in Sumter all evening on June 18. Finally, Roberts attempted to show that the funds he used to purchase the automobile were the proceeds of an insurance settlement he obtained on the morning of June 19.

Roberts subsequently was convicted of three counts of capital murder and was sentenced to death.[3] The South Carolina Supreme Court affirmed on direct appeal, and the United States Supreme Court denied certiorari. See State v. Copeland, 300 S.E.2d 63 (S.C. 1982), cert. denied, 463 U.S. 1214 (1983). Thereafter, a state court denied Roberts' application for post-conviction relief (PCR) after an evidentiary hearing, reasoning that his claims were without merit. The United States Supreme Court again denied certiorari. See Roberts v. Aiken, 478 U.S. 1022 (1986).

In April 1987, Roberts filed this action in the district court, alleging numerous claims. The district court denied relief. Roberts now appeals.

_____

[3] Roberts also was convicted of three counts of kidnaping and one count of armed robbery. Those convictions and the resulting sentences are not at issue here.

4

II.

Roberts first maintains that his right to the effective assistance of counsel was denied when the State scheduled his trial to begin 60 days after the appointment of counsel.**4** In the usual case, entitlement to relief on a claim of ineffective assistance of counsel depends upon a showing that counsel's performance "fell below an objective standard of reasonableness" and that the petitioner suffered prejudice, i.e., "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). Here, however, Roberts does not argue that the attorneys appointed to assist in his defense were incompetent. Rather, he maintains that the period of time between counsel's appointment and trial was so abbreviated that his attorneys were not given adequate time to prepare for the guilt and sentencing phases of his trial, thereby depriving him of his right to the assistance of counsel.

"An accused's right to be represented by counsel is a fundamental component of our criminal justice system." United States v. Cronic, 466 U.S. 648, 653 (1984). And, the appointment of counsel to assist in the presentation of an indigent defendant's case must be more than a mere formality to satisfy the strictures of the Constitution. See Avery v. Alabama, 308 U.S. 444, 446 (1940). Thus, the constitutional guarantee of the assistance of counsel necessarily includes the "opportunity for appointed counsel to confer, to consult with the accused and to prepare his defense." Id.; see Cronic, 466 U.S. at 654-55.

A relatively short period of time for trial preparation, however, does not necessarily constitute a deprivation of the right to counsel. See Cronic, 466 U.S. at 658 ("Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated."). But, in some cases, the deprivation caused by the lack of time between appointment of counsel and trial may be so serious as to warrant a finding of a constitutional violation without a showing of actual prejudice. See id. at 659-

_____

**4** Counsel moved for a continuance, but that motion was denied by the trial court. Roberts does not claim that the denial of the motion for continuance violated due process.

5

61 (explaining that in some circumstances "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial"); Powell v. Alabama, 287 U.S. 45, 56-59 (1932) (holding that appointment of counsel on the day of trial in a capital case violated the right to counsel without considering whether the defendants actually were prejudiced). Generally, though, "the accused [must] show how specific errors of counsel undermined the reliability of the finding of guilt." Cronic, 466 U.S. at 659 n.26.

With respect to the guilt phase of his trial, Roberts does not point to any specific errors that resulted from a lack of time to prepare. Accordingly, we address whether the circumstances surrounding the guilt phase of Roberts' trial were such that Roberts is entitled to a presumption that he was prejudiced by counsel's inability to prepare.**5** And, we conclude that a presumption of prejudice is not warranted. An attorney first was appointed for Roberts fully two months before his trial. That attorney promptly rearranged his schedule to accommodate his new responsibilities; repeatedly spoke with Roberts regarding the case; consulted with other attorneys familiar with the defense of capital cases; and attended a three-day seminar on death-penalty trials. A second attorney was appointed for Roberts three weeks before trial, and that attorney also arranged his schedule to devote substantially all of his time to Roberts' defense. Both attorneys were experienced in criminal law. By their own estimate, they spent in excess of 500 hours preparing for trial. Moreover, although the charges against Roberts and the possible consequence of conviction were grave, Roberts' defense to those charges--that he simply was not with Copeland and Coker on the night of June 18 and morning of June 19--was relatively uncomplicated to prepare and present. Finally, our review of

_____

**5** Roberts vigorously denies that he is claiming that the circumstances surrounding the guilt phase of the trial should give rise to a presumption of prejudice. However, in light of Roberts' failure to identify any particular errors that might demonstrate actual prejudice, the only basis for a conclusion that Roberts' constitutional rights were violated is a presumption of prejudice. We are confident that, faced with the alternatives of having us examine the guilt phase of the trial for a presumption of prejudice or not at all, Roberts would choose the former.

6

the trial transcript indicates that counsel rigorously tested the State's case during the guilt phase of the trial. In short, the circumstances surrounding the guilt phase of Roberts' trial do not justify a presumption that Roberts suffered prejudice due to a lack of time for his attorneys to prepare for trial. See id. at 663-66 (concluding that presumption of prejudice was not warranted even though, inter alia, counsel was appointed only 32 days before trial and had never tried a criminal case); Avery, 308 U.S. at 447, 450-53 (ruling that appointment of counsel three days before capital trial did not justify presumption of prejudice under the circumstances of the case).

Regarding the sentencing phase of his trial, Roberts maintains that the lack of time to prepare prejudiced him by making it impossible for his attorneys to develop evidence in mitigation. In support of this argument, Roberts points to studies conducted after trial indicating that he suffers from organic brain damage that affects his ability, inter alia, to think rationally and to appreciate the long-term consequences of his actions, and that he was raised by two alcoholic parents who abused him physically and mentally. Roberts maintains that if his attorneys had had adequate time to develop this mitigating evidence, there is a reasonable probability that the jury would have recommended a sentence of life imprisonment. See Strickland, 466 U.S. at 694.

Assuming that the evidence Roberts claims should have been submitted to the jury is in fact mitigating, Roberts suffered no prejudice. During the penalty phase, Dr. William H. Snyder, Jr. testified that Roberts' father was an alcoholic who beat Roberts' mother in front of their children; that Roberts' "household really must have been a bad situation," J.A. 1828; that Roberts suffered from minimal brain dysfunction syndrome that diminished his ability to concentrate and to consider the consequences of his behavior; that Roberts had been devastated by the shooting death of his brother in 1979; and that although Roberts began using drugs and alcohol at an early age, after his brother's death his drug usage increased dramatically and he began to behave erratically. Dr. Snyder also informed the jury that he had been unable, due to time constraints, to fully investigate Roberts' background. Additionally, Roberts' mother and sisters testified that Roberts had been beaten by his father while a child; that Roberts felt guilt over the death of his brother, who had died in Roberts' arms; and

7

that Roberts was not a violent person. Thus, the evidence Roberts now contends the jury should have received was actually presented to the jury through the testimony of Dr. Snyder and Roberts' family members. Under these circumstances, counsel's assumed inability to develop additional psychiatric testimony in mitigation does not undermine our confidence in the outcome of the penalty phase.

III.

Roberts next maintains that the State failed to provide exculpatory information as required by Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. More specifically, Roberts claims that the State failed to disclose all of the terms of an agreement between Coker and the State regarding certain pending charges; exculpatory information regarding physical evidence found at the scene of the Spain and Krause murders; and statements by various persons that contradicted the State's evidence. Roberts argues that this information could have been used to impeach Coker's credibility; to contradict the State's version of the timing of the events of that evening; to support Roberts' alibi defense; and to provide additional mitigating evidence to the jury during the penalty phase.

Suppression by the government of evidence favorable to the defense that is material to the outcome of a trial or sentencing proceeding violates due process, irrespective of the motive of the prosecutor. See Brady, 373 U.S. at 87. In addition to the disclosure of exculpatory evidence, due process requires the government to disclose evidence affecting the credibility of prosecution witnesses. See Giglio v. United States, 405 U.S. 150, 154 (1972). Undisclosed evidence is material when its cumulative effect is such that "`there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)); see id. at 436-37 (explaining that "suppressed evidence [must be] considered collectively, not item by item"). A "reasonable probability" is one sufficient to undermine confidence in the outcome. See id. at 434 (internal quotation marks omitted).

With these principles in mind, we turn to an examination of the various pieces of evidence Roberts maintains were not disclosed to

8

him. As set forth in more detail below, we conclude that the evidentiary items Roberts claims were suppressed by the State, whether viewed singly or collectively, do not constitute material evidence favorable to the defense.

Roberts first maintains that the State failed to disclose all of the details of a plea agreement between Coker and the State concerning charges unrelated to the murders of Spain, Krause, and Cakley. According to Roberts, at the time of Coker's trial testimony Coker knew that he would serve little or no active prison time on those charges--contrary to his testimony and information provided to the defense that Coker would receive a sentence of between one and 20 years imprisonment. Even if the State failed to disclose the existence of an agreement regarding the amount of time Coker would serve, however, the evidence is not material in light of Roberts' thorough impeachment of Coker's credibility. By the end of cross-examination, the jury knew not only that Coker had received complete immunity for his role in the crimes with which Roberts was charged, but also that he possessed an extensive criminal record. Roberts' claim that the State violated Brady by failing to disclose the details of Coker's agreement regarding other pending charges therefore is without merit.

During the trial, the State presented expert testimony from Lieutenant Frank DeFreese of the State Law Enforcement Division that plaster casts of tire marks left at the scene of the Spain and Krause murders were generally consistent with the tread on the tires of Copeland's vehicle. Roberts contends that the State failed to divulge the existence of a measurement of the width of one of the tire marks taken by an investigating officer that was inconsistent with the tread on Copeland's automobile.[6] Roberts further maintains that this information is material because it would have allowed him to challenge DeFreese's testimony. Our review of the record, however, indicates that the evidence Roberts claims should have been disclosed to the defense was not material. DeFreese candidly admitted that he lacked sufficient information to positively identify Copeland's vehicle as the automobile that left the tire marks. Furthermore, defense counsel was

_____

[6] In connection with the state PCR hearing, DeFreese submitted an affidavit characterizing the measurement taken by the investigating officer as "obviously wrong." J.A. 1423.

9

allowed to examine the casts--which provided tangible evidence of the width of the tire marks--when they were introduced into evidence, thus providing ample opportunity to impeach DeFreese's testimony based upon the physical evidence. Cf. United States v. Smith Grading & Paving, Inc., 760 F.2d 527, 532 (4th Cir. 1985) (explaining that "[n]o due process violation occurs as long as Brady material is disclosed to a defendant in time for its effective use at trial").

Roberts also contends that the State did not reveal that one of the investigating officers believed that a footprint found at the scene of the Spain and Krause murders might have been made by a woman and as a result other suspects were investigated. Again, the officer's impression and the actions he took based upon that impression are not material evidence. In the first place, there is no indication that the footprint in question actually was made by a woman. And, importantly, it was made clear to the jury that the investigation of the murders did not focus immediately on Copeland, Coker, and Roberts, but initially encompassed other suspects, in part because of observations by investigating officers of the physical evidence--including footprints that may have been left by the perpetrators.

Finally, Roberts maintains that the State failed to disclose several statements made by various persons to investigating officers that contradicted the timing established by the State through Coker's testimony.[7] Roberts thoroughly and effectively cross-examined Coker concerning whether it was possible for the events of June 18-19 to have taken place as Coker claimed. In the face of this questioning, Coker admit-

_____

[7] In particular, Roberts complains that the State failed to disclose the following: a statement by Coker that he, Copeland, and Roberts arrived in Charleston by 8:00 p.m. on June 18; a statement by Charles Convertino that the three men visited him between 9:00 and 10:00 p.m.; a statement by Evelyn Kay Cooley that she saw Louis Cakley at approximately 5:00 a.m.; a law enforcement officer's conflicting statements regarding the time at which he discovered that Cakley was missing; a statement by John Berry Adler that he saw lights and people inside the Port Oil Station between 12:30 and 12:45 a.m.; a statement by James Walter Branton that he heard shots from the field where Cakley was murdered at 5:45 a.m.; and a statement by Kenneth Pace that he observed a vehicle with round taillights in the vicinity of the Spain and Krause murders.

ted that his estimates regarding the timing of the abductions and murders were not reliable. Thus, any testimony regarding the inaccuracy of Coker's recollections would merely have been cumulative of his candid admission that he did not know what time certain events occurred. We therefore conclude that this information was not material to Roberts' defense.

IV.

Roberts also maintains that an instruction to the jury during the guilt phase of the trial shifted the burden of proof on the element of malice from the prosecution to him in violation of the Due Process Clause of the Fourteenth Amendment, which requires that the State prove each element of a charged offense beyond a reasonable doubt. See Yates v. Evatt, 500 U.S. 391, 400-01 (1991). We conclude that although the challenged instruction is unconstitutional, the error was harmless.

Under South Carolina law, "`[m]urder' is the killing of any person with malice aforethought, either express or implied." S.C. Code Ann. § 16-3-10 (Law. Co-op. 1985) (emphasis omitted). And, malice is a "wrongful intent to injure another and indicates a wicked or depraved spirit intent on doing wrong." State v. Johnson, 352 S.E.2d 480, 481 (S.C. 1987) (per curiam); see also State v. Glenn, 492 S.E.2d 393, 398 (S.C. Ct. App. 1997) ("Malice is the doing of a wrongful act intentionally and without just cause or excuse."). Although an unjustified or inexcusable specific intent to kill constitutes malice, a specific intent to kill is not required. See State v. Foust, 479 S.E.2d 50, 51 & n.2 (S.C. 1996).

Before the jury retired to deliberate Roberts' guilt, the trial court instructed the jury that malice is presumed "from the willful, deliberate and intentional doing of an unlawful act without just cause and excuse" and from the use of a deadly weapon. J.A. 765-67. Although the trial court also instructed the jury that the presumption of malice was rebuttable and that it was to decide based upon all of the evidence presented whether malice had been established beyond a reasonable doubt, Roberts maintains that the instruction on presumed malice impermissibly shifted the burden of proof from the State to him on this issue. See Yates, 500 U.S. at 400-02. The State concedes that the

11

presumed malice instruction amounted to an error of constitutional magnitude. And, although we are not bound by the State's concession, see Sibron v. New York, 392 U.S. 40, 58 (1968), we agree that the challenged instruction constituted an unconstitutional burden-shifting instruction, see Hyman v. Aiken, 824 F.2d 1405, 1409 (4th Cir. 1987). The dispositive issue with respect to this claim, then, is whether the error occasioned by the unconstitutional instruction was harmless.

Once a state criminal defendant has received direct review of his conviction and sentence, principles of comity and federalism dictate that we not overturn that presumptively legal judgment on the basis of a constitutional error unless we either are convinced that "the error `had substantial and injurious effect or influence in determining the ... verdict,'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)), or at a minimum entertain grave doubt that it had such an effect, see O'Neal v. McAninch, 513 U.S. 432, 437 (1995) (holding that when "the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the judge must resolve that doubt in favor of the habeas petitioner).**8** In applying this standard, we do not ask whether the evidence of guilt was sufficient, whether the jury would have reached the same conclusion if the error had not occurred, or whether the jury reached the correct result based on the evidence presented. See Satcher v. Pruett, 126 F.3d 561, 567-68 (4th Cir.), cert. denied, 118 S. Ct. 595 (1997). Rather, we review the record de novo to determine whether the error "substantially sway[ed] or substantially influence[d] the response" of the jury to the question put to it--i.e., in the guilt context, whether the defendant is guilty or not guilty. Cooper v. Taylor, 103 F.3d 366, 370 (4th Cir. 1996) (en

---

**8** The Brecht Court left open the possibility that under unusual circumstances "a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." Brecht, 507 U.S. at 638 n.9. Roberts' claim that his trial was tainted by an unconstitutional burden-shifting instruction is not such a claim. See Yates, 500 U.S. at 407-11 (conducting analysis of whether burden-shifting instruction was prejudicial).

banc), <u>cert. denied</u>, 118 S. Ct. 83 (1997); <u>see O'Neal</u>, 513 U.S. at 436 (explaining that in making the harmlessness determination, a federal habeas judge must review the record to assess whether "the judge[ ] think[s] that the error substantially influenced the jury's decision" (internal quotation marks omitted)); <u>Brecht</u>, 507 U.S. at 637 (holding that an error does not have a substantial and injurious effect on a jury verdict unless "it resulted in `actual prejudice'" to the habeas petitioner (quoting <u>United States v. Lane</u>, 474 U.S. 438, 449 (1986))); <u>cf. Yates</u>, 500 U.S. at 405 (holding that harmless-error analysis of an unconstitutional burden-shifting instruction "requires an identification and evaluation of the evidence considered by the jury in addition to the presumption itself").

Our review of the record from Roberts' trial leaves no doubt that the burden-shifting instruction on presumed malice had no substantial or injurious effect on the verdict. The evidence presented established that Roberts actively participated in the abduction and murder of three people. And, according to Coker--whose testimony the jury necessarily credited in convicting Roberts--Roberts promised Copeland after the shootings of Spain and Krause that he would kill the next victim. In fact, Roberts did murder Louis Cakley, shooting him first in the back as Cakley walked away and then twice more at nearly point-blank range. As if these acts of depravity were not enough, Roberts mutilated Krause's body in order "to make sure[he was] dead." J.A. 425 (internal quotation marks omitted).**9**

Considering the totality of the overpowering evidence of malice that the jury had before it, there can be no doubt that the erroneous instruction had no effect whatsoever on the verdicts, much less a substantial and injurious one. <u>See, e.g.</u>, <u>Plath v. Moore</u>, 130 F.3d 595, 598-99 (4th Cir. 1997) (holding unconstitutional burden-shifting instruction harmless in light of overwhelming evidence of malice);

_____

**9** At no time has Roberts asserted that the deaths of Spain, Krause, and Cakley occurred by accident or were the result of self-defense or some other legal justification or excuse. <u>Cf. Houston v. Dutton</u>, 50 F.3d 381, 383, 386-87 (6th Cir. 1995) (holding unconstitutional burden-shifting instruction on presumed malice was not harmless because it essentially prevented jury from considering defendant's lone argument that the murder, produced by three gunshot wounds, was accidental).

13

Arnold v. Evatt, 113 F.3d 1352, 1356-57 (4th Cir. 1997) (same), cert. denied, 66 U.S.L.W. 3456, (U.S. Jan. 12, 1998) (No. 97-6646). Accordingly, the unconstitutional burden-shifting instruction is harmless and provides no basis for habeas relief.

## V.

Roberts presents a final claim, which we conclude is procedurally defaulted. Roberts contends that comments by the trial court chilled the exercise of his right to testify in his own defense, in violation of the Constitution. During the sentencing phase of Roberts' trial, defense counsel commented to the court that Roberts was considering testifying on his own behalf, but was concerned that statements made could be used against him in the event of a retrial. In response, the trial court stated:

> I cannot tell Mr. Roberts whether to take the stand or not. That is a decision that he will have to make. Of course, as you know, if he takes the stand, a record will be made. And, of course, if there is a new trial, that record would be admissible in another court.

J.A. 779-80. Roberts asserts that these comments amounted to a threat that his testimony would be used against him in the future and that they precluded him from exercising his right to testify.

Absent cause and prejudice or a miscarriage of justice, a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule. See Harris v. Reed, 489 U.S. 255, 262 (1989). Such a rule is adequate if it is regularly or consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and is independent if it does not "depend[ ] on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985).[10]

_____

[10] Roberts makes no attempt to establish cause and prejudice or a fundamental miscarriage of justice to excuse the default, and therefore we do not consider whether either exists. See Kornahrens v. Evatt, 66 F.3d 1350, 1361-63 (4th Cir. 1995).

14

Although Roberts argued on direct appeal that the statement of the trial court impermissibly chilled his right to testify, he claimed only a violation of South Carolina law. Because Roberts did not contend that the comments of the trial court violated a federal constitutional right, he has failed to exhaust the claim he now seeks to raise. See Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam) (holding that argument to state court that an evidentiary ruling by trial court violated state law was insufficient to exhaust claim that the ruling constituted a violation of a federal constitutional right, and rejecting the argument that similarity of claims is adequate to exhaust); Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir.) (explaining that in order for federal claim to be exhausted, its substance must be presented to the state court), cert. denied, 118 S. Ct. 102 (1997). Because presentation of this claim to the state court at this juncture would be fruitless, see Drayton v. Evatt, 430 S.E.2d 517, 519-20 (S.C. 1993) (holding that "errors which can be reviewed on direct appeal may not be asserted for the first time, or reasserted, in post-conviction proceedings"), it is properly considered to be procedurally barred. See George v. Angelone, 100 F.3d 353, 363 (4th Cir. 1996) ("A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally defaulted under state law if the petitioner attempted to raise it at this juncture."), cert. denied, 117 S. Ct. 854 (1997). We therefore hold this claim to be procedurally defaulted.

VI.

In sum, we conclude that all of Roberts' claims lack merit or are procedurally defaulted and that he has failed to make the substantial showing of the denial of a federal right required for the grant of a certificate of probable cause to appeal. See Lozada v. Deeds, 498 U.S. 430, 431-32 (1991) (per curiam) (explaining that to warrant the grant of a certificate of probable cause to appeal, a habeas petitioner must "make a substantial showing of the denial of[a] federal right" and that to satisfy this showing, the petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further" (internal quotation marks & emphasis omitted; alterations in original)).**11** Accord-

_____

**11** We need not determine whether Roberts should have sought a certificate of appealability pursuant to 28 U.S.C.A. § 2253(c)(1) (West Supp.

ingly, we deny his application for a certificate of probable cause and dismiss this appeal.

<u>DISMISSED</u>

_____

1997) because his failure to make the showing required for the grant of a certificate of probable cause necessarily indicates that he cannot satisfy the standard for the grant of a certificate of appealability. <u>See Lozada</u>, 498 U.S. at 431-32; <u>Murphy v. Netherland</u>, 116 F.3d 97, 101 (4th Cir.) (denying certificate of appealability under § 2253 in habeas corpus action seeking relief from death sentence when petitioner failed to make a substantial showing of the denial of a constitutional right), <u>cert. denied</u>, 118 S. Ct. 26 (1997).

16